UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| NICOLE BOBO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:19-CV-199 PLC |
| | ) |
| ANDREW SAUL,[1] | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

Plaintiff Nicole Bobo seeks review of the decision of Defendant Social Security Commissioner Andrew Saul finding that her disability ended on August 1, 2014. The parties consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c). [ECF No. 8] For the reasons set forth below, the Court reverses and remands the Commissioner's decision.

**I.     Background**

In June 2010, an ALJ found that Plaintiff, who was born September 1973, was disabled as a result of bipolar disorder with psychotic features and attention deficit disorder and therefore entitled to Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under the Social Security Act. (Tr. 101-10)  In July 2014, the Social Security Administration (SSA) informed her that, based upon a review of medical records from 2014, significant medical improvement to her mental health warranted the cessation of her DIB and SSI benefits.

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted pursuant to Fed. R. Civ. P. 25(d).

1

Plaintiff filed a request for reconsideration, and, in December 2014, a disability hearing officer questioned Plaintiff, analyzed the evidence, and concluded that she was not disabled. (Tr. 176-90) Plaintiff filed a request for a hearing before an administrative law judge (ALJ), and an ALJ conducted a continuing disability review (CDR) hearing in April 2015. (Tr. 36-52) The ALJ issued a decision in April 2016 finding Plaintiff was no longer disabled. (Tr. 123-41)

Plaintiff appealed the ALJ's decision to the SSA Appeals Council. (Tr. 478-79) In June 2017, the SSA Appeals Council granted Plaintiff's request for review and remanded the case to the ALJ. (Tr. 149-51) In its remand order, the SSA Appeals Council directed the ALJ to: (1) offer Plaintiff an opportunity to present interrogatories to a vocational expert or question a vocational expert at the hearing; (2) further evaluate the date of medical improvement; (3) consider Plaintiff's RFC and provide appropriate rationale for the assessed limitations; and (4) if warranted by the expanded record, obtain supplemental evidence from a vocational expert. (Tr. 150)

The ALJ conducted a second hearing in May 2018 and issued a decision in August 2018 concluding that Plaintiff's "disability ended on August 1, 2014, and the claimant has not become disabled again since that date[.]" (Tr. 10-26, 53-100) Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review. (Tr. 1-4) Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the Commissioner's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II.     Evidence Before the ALJ[2]

At the April 2015 hearing, Plaintiff testified that she lived with her children, ages thirteen and sixteen, and she had been seeing her current psychiatrist, Dr. Rao, since June or July 2014.

---

[2] Because Plaintiff does not challenge the ALJ's determination of her physical functioning, the Court limits its discussion to the evidence relating to Plaintiff's mental impairments.

(Tr. 43-44) Before establishing care with Dr. Rao, Plaintiff received mental health treatment from Dr. Taca, who "canceled [her] as a patient" because she missed three appointments. (Tr. 42) Plaintiff explained there was a gap in her mental health treatment because she "was having trouble finding another doctor that accepted Medicaid and Medicare." (Tr. 42)

Plaintiff testified that Dr. Rao managed her mental health medications and stated: "I take four pills a day now, two in the morning and two at night; but I still don't feel normal, even with the medicine[.]" (Id.) Because Plaintiff's insurance did not cover the sleep medication prescribed by Dr. Rao, Plaintiff had been having difficulty sleeping, "only getting, like, four hours [of] sleep." (Id.)

In regard to activities of daily living, Plaintiff testified that her children helped with the laundry and cared for the family dog, a chihuahua. (Tr. 43, 51) Plaintiff had a driver's license but no car, so her relatives gave her rides or loaned her their cars. (Tr. 49-50) When the ALJ asked about medical treatment notes reflecting that Plaintiff had ridden a motorcycle,[3] Plaintiff explained that her friend "was trying to teach me how to ride" on his motorcycle, but "I haven't been on a bike in a long time[.]" (Tr. 50)

At her subsequent hearing in May 2018, Plaintiff testified that she believed she remained disabled because "I still feel the same …. I still need my medicine…. I've been hospitalized a few times since then." (Tr. 58) When the ALJ asked Plaintiff why she was unable to work a sedentary job, Plaintiff explained: "I don't be remembering a lot of stuff, so I don't think I'd be that focused to be remembering, and I be really tired a lot with all the medication I take. I take, like, 14, 15

---

[3] Plaintiff's treatment records reflect that, in May 2014, she saw her primary care physician for bee stings she received while riding a motorcycle. (Tr. 686)

3

pills a day." (Tr. 62) Plaintiff later elaborated, "I think I get upset over the little things and be irritated, because I be sleepy." (Tr. 67)

Plaintiff continued to see Dr. Rao every month for mental health treatment. (Tr. 63-64) Plaintiff explained: "I talk to her a little bit, and she prescribed my medicine. A lot of times I've been to the hospital, she's the one who told me to go check in." (Tr. 64) On the occasions Plaintiff was hospitalized for mental health treatment, she was "really stressed," experiencing crying spells, and thoughts of harming herself. (Tr. 65) Plaintiff would like to resume treatment at "the outpatient place I was going to," but her insurance would not cover it. (Tr. 65-66)

Plaintiff did not like to be around other people because it made her feel "pressured." (Tr. 67) For example, when she was participating in an intensive outpatient program, "they let me sit in a corner, because I didn't want to sit at the table" because there were "too many people at the table" and "it seemed really germy[.]" (Id.) Plaintiff testified that she had trouble remembering things, such as doctor appointments, and once drove past her highway exit because "I just forgot going…. And stuff like that happens a lot." (Tr. 68)

Plaintiff stated that her medications caused her to feel "draggy" for "a few hours" every morning. (Tr. 70) On a typical day, Plaintiff spent about five or six daylight hours "[l]ooking at the TV or laying down." (Tr. 73, 76) Plaintiff's teenaged children did the household chores, such as sweeping, and the family ate "a lot of things … microwaved or oven." (Tr. 72) Plaintiff's children used the oven but she no longer did because she often forgot it was on. (Id.)

A vocational expert also testified at the hearing. (Tr. 77-96) The ALJ asked the vocational expert to consider a hypothetical individual with the same age, education, and work experience as Plaintiff who was able to perform light work with the following limitations:

> Never climb ropes, ladders or scaffolds. Occasionally climb ramps and stairs. Occasionally stoop, kneel, crouch. Never crawl…. Limited to simple, routine-

> type tasks consistent with an SVP 1 or 2. Also limited to the ability to make occasional work-related decisions and occasional changes in the work setting. Then to avoid direct interaction with the public… And then also, casual and infrequent interaction with coworkers…. No tandem tasks and occasional interaction with supervisors.

(Tr. 83-85) The vocational expert testified that such an individual could perform the jobs of bagger and garment folder. (Tr. 86-87) When the ALJ further limited the hypothetical individual to sedentary work, the vocational expert stated that the individual could work as a stone setter, bench hand, or escort vehicle driver. (Tr. 87-88) Additionally, the vocational expert testified that, to maintain employment, the hypothetical individual could not miss more than two days of work per month or be off task more than ten percent of the workday. (Tr. 88)

In regard to Plaintiff's medical records, the Court adopts the facts set forth in Plaintiff's statement of uncontroverted material facts, as admitted by the Commissioner. [ECF Nos. 22, 26-1] The Court also adopts the facts set forth in the Commissioner's statement of additional facts, because Plaintiff does not dispute them. [ECF No. 26-1]

### III. Standard for Continuing Disability Review

Eligibility for disability benefits under the Social Security Act ("Act") requires a claimant to demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ...." 42 U.S.C. § 1382c(a)(3)(B).

5

"Once an individual becomes entitled to disability benefits, his continued entitlement to benefits must be reviewed periodically." Bennett v. Colvin, 174 F.Supp.3d 1031, 1037 (E.D. Mo. 2016). See 42 U.S.C. § 423(f)(1); 20 C.F.R. §§ 404.1594, 416.994. The Commissioner may terminate benefits to a person previously adjudged to be disabled upon substantial evidence that the individual's condition has improved "to the point where he is able to perform substantial gainful activity." Delph v. Astrue, 538 F.3d 940, 945 (8th Cir. 2008). The regulations define "medical improvement" as:

> any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on improvement in the symptoms, signs, and/or laboratory findings associated with your impairment(s).

20 C.F.R. § 404.1594(b)(1). See also 20 C.F.R. § 416.994(b)(1)(i).

Under the regulations, the disability review process involves a sequential analysis of up to eight steps. Delph, 538 F.3d at 945. When deciding whether a claimant's disability has ceased, the Commissioner must determine:

> (1) whether the claimant is currently engaging in substantial gainful activity, (2) if not, whether the disability continues because the claimant's impairments meet or equal the severity of a listed impairment, (3) whether there has been a medical improvement, (4) if there has been medical improvement, whether it is related to the claimant's ability to work, (5) if there has been no medical improvement or if the medical improvement is not related to the claimant's ability to work, whether any exception to medical improvement applies, (6) if there is medical improvement and it is shown to be related to the claimant's ability to work, whether all of the claimant's current impairments in combination are severe, (7) if the current impairment or combination of impairments is severe, whether the claimant has the residual functional capacity to perform any of his past relevant work activity, and (8) if the claimant is unable to do work performed in the past, whether the claimant can perform other work.

Dixon v. Barnhart, 324 F.3d 997, 1000-01 (8th Cir.2003) (citing 20 C.F.R. § 404.1594(f)).

The "medical improvement" standard therefore "requires the Commissioner to compare a claimant's current condition with the condition existing at the time the claimant was found disabled and awarded benefits." Delph, 538 F.3d at 945.

## IV. ALJ's Decision

On remand, the ALJ first noted that the most recent medical decision finding Plaintiff disabled, or "comparison point decision," was an ALJ decision dated June 14, 2010. (Tr. 12) At the time of the comparison point decision, Plaintiff's medically determinable impairments included bipolar disorder with psychotic features and attention deficit disorder.[4] (Id.)

The ALJ further found that, through the date of her decision, Plaintiff had not engaged in substantial gainful activity and, since August 1, 2014, Plaintiff had the following medically determinable impairments: bipolar disorder, depressed with psychotic features, degenerative joint disease of the knee, and tumid lupus. (Tr. 12-13) The ALJ determined that, since August 1, 2014, Plaintiff did not have an impairment or combination of impairments which met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 13)

Next, the ALJ found that medical improvement occurred as of August 1, 2014 such that the "impairments present at the time of the [comparison point decision] decreased in medical severity to the point where the claimant has had the residual functional capacity to no *direct* interaction with the public and casual and infrequent interaction with co-workers" and she was

---

[4] According to the June 2010 decision, Plaintiff had the residual functional capacity (RFC) to perform "simple, routine and repetitive tasks in a work environment free of fast-paced quota requirements involving only simple work-related decisions with few, if any, work place changes and no interaction with the public and only casual and infrequent contact with co-workers." (Tr. 107) Based on the testimony of a vocational expert, the ALJ found that Plaintiff could not perform any past relevant work or any jobs that existed in significant numbers in the national economy. (Tr. 109)

7

"able to make *occasional* work-related decisions and have *occasional* changes in the work setting." (Tr. 15-16) (emphasis in original)  Although Plaintiff continued to have the severe impairments of bipolar disorder, depressed with psychotic features, degenerative joint disease, and tumid lupus after August 1, 2014, the ALJ determine that she had the RFC to perform a limited range of light work. (Tr. 16-17)  More specifically, the ALJ found that Plaintiff was able to perform light work with the following limitations:

> [T]he claimant is able to stand 6 hours in an 8[-]hour workday, walk 6 hours in an 8[-]hour workday and has no limits on her ability to sit.  She is capable of lifting and carrying 25 pounds frequently and 50 pounds occasionally.  Further, the claimant should never climb ropes, ladders, or scaffolds but is able to occasionally climb ramps and stairs.  She is able to occasionally stoop, kneel and crouch but should never crawl.  The claimant is limited to simple, routine tasks consistent with an SVP 1 or 2.  She is able to make occasional work-related decisions and have occasional changes in the work setting.  The claimant should have no direct interaction with the public, but is able to have casual and infrequent interaction with co-workers and occasional interaction with supervisors.

(Tr. 17)

Based on the vocational expert's testimony, the ALJ concluded that Plaintiff was unable to perform any past relevant work but had the RFC to perform other jobs that existed in significant numbers in the national economy, such as bagger, garment folder, stone setter, bench hand, and escort vehicle driver.  (Tr. 24-25)  The ALJ therefore concluded that Plaintiff's "disability ended on August 1, 2014, and the claimant has not become disabled against since that date[.]"  (Tr. 26)

## V.     Discussion

Plaintiff claims that substantial evidence did not support the ALJ's decision that she was no longer disabled because the ALJ failed to (1) base the RFC determination on "some medical evidence" and (2) properly weigh the opinion of Plaintiff's psychiatrist.[5]  [ECF No. 23]  In

---

[5] Plaintiff asserts that her treating psychiatrist's opinion was entitled to substantial, if not controlling, weight. In March 2017, the Social Security Administration amended the regulations

8

response, the Commissioner argues that substantial evidence supported the ALJ's finding that medical improvement related to the Plaintiff's ability to work occurred on August 1, 2014. [ECF No. 26]

A court reviews "the denial of benefits pursuant to the continuing disability review process for substantial record evidence to support the ALJ's decision." Dixon, 324 F.3d at 1000 (citing Muncy v. Apfel, 247 F.3d 728, 730 (8th Cir. 2001)). See also Burress v. Apfel, 141 F.3d 875, 879 (8th Cir. 1998) ("[W]e review the ALJ's decision to determine whether his conclusion that [the plaintiff] was no longer disabled … due to a medical improvement, is supported by substantial evidence in the record as a whole."); Scott v. Astrue, No. 11-0652-CV-W-FJG, 2012 WL 1324519, at *2 (W.D. Mo. Apr. 17, 2012) ("When benefits have been denied based on a determination that a claimant's disability has ceased, the issue is whether the claimant's medical impairments have improved to the point where she is able to perform substantial gainful activity."). "Substantial evidence is relevant evidence that reasonable minds might accept as adequate to support the decision." Dixon, 324 F.3d at 1000 (citing Hunt v. Massanari, 250 F.3d 622, 623 (8th Cir. 2001)).

Plaintiff's medical records reveal that, between July 2013 and July 2014, Plaintiff discussed her mental impairments with her primary care physician Dr. Mertens but did not see a

---

governing the evaluation of medical evidence. Those amended regulations now provide that the Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) ..., including those from your medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Under the new rules, the Commissioner evaluates the "persuasiveness" of all medical opinions according to several enumerated factors, the "most important" being supportability and consistency. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). See also Mudge v. Saul, No. 4:18-CV-693 CDP, 2019 WL 3412616, at *4 (E.D. Mo. July 29, 2019). While generally these new rules apply to only those claims filed on or after March 27, 2017, see 20 C.F.R. §§ 404.1520c, 416.920c, they also apply to all continuing disability reviews, with certain exceptions not applicable here. See Social Security Administration, Program Operations Manual System (POMS), DI 24503.050 (effective Apr. 3, 2017 to present).

psychiatrist. (Tr. 545-46, 753-54, 762). Plaintiff began treating with psychiatrist Dr. Rao in July 2014, and continued to see her approximately once a month for at least the next three years.[6] At Plaintiff's initial appointment with Dr. Rao, Plaintiff reported mood swings, depressed mood, crying, anxiety, low energy, and poor sleep. (Tr. 843) Dr. Rao diagnosed Plaintiff with "schizophrenia/psychoses" and bipolar disorder and prescribed Latuda. (Id.) Later that month, Plaintiff's mental status examination was within normal limits, and Plaintiff reported to Dr. Rao that she was tolerating the medications well, although she continued to experience irritability. (Tr. 842) Dr. Rao increased Plaintiff's Latuda. (Id.)

In August 2014, state agency psychological consultant Dr. Toll reviewed Plaintiff's medical records and found that Plaintiff had the non-severe impairments of "bipolar and depression" with no resulting functional impairments. (Tr. 848-51, 856) Dr. Toll explained that, because Dr. Rao's July 2014 mental status examination was within normal limits "prior to med adjustment clmt functioning would not be expected to decline with further med adjustments…." (Tr. 858)

In mental status examinations, Dr. Rao noted Plaintiff's dysthymic affect in August 2014, November 2014, December 2014, and February 2015. (Tr. 867-69, 871) Dr. Rao completed a mental RFC assessment for Plaintiff in March 2015, stating that she treated Plaintiff monthly or bimonthly for bipolar disorder. (Tr. 861-65) Dr. Rao listed "mood swings, anxiety, paranoia" as clinical findings demonstrating the severity of Plaintiff's condition. (Tr. 861) On a checklist form, Dr. Rao noted the following symptoms: anhedonia, decreased energy, generalized persistent anxiety, psychomotor agitation or retardation, persistent disturbances of mood or affect, paranoid

---

[6] Dr. Rao's treatment notes are handwritten, brief, and difficult to read.

thinking, emotional withdrawal or isolation, and episodic periods of both manic and depressive syndromes. (Tr. 862)

As a result of Plaintiff's symptoms, Dr. Rao opined that she: was "unable to meet competitive standards" in the following functional areas: remember work-like procedures; maintain regular attendance; sustain an ordinary routine; work in coordination or proximity to others; complete a normal workday without interruptions from psychologically based symptoms; perform at a consistent pace; accept instructions and respond appropriately to criticism; get along with coworkers and peers; respond appropriately to changes in work setting; deal with normal stress; be aware of normal hazards and take precautions; understand, remember, and carry out detailed instructions; interact appropriately with the general public; and maintain socially appropriate behavior. (Tr. 863-64) Dr. Rao estimated that Plaintiff would miss an average of four or more days of work per month.[7] (Tr. 865)

In late-April 2015, Plaintiff presented to an emergency room with complaints of depression and suicidal ideation, and she was hospitalized for three days. (Tr. 1047-49, 1067-70) At Plaintiff's follow-up appointment with Dr. Mertens, she observed Plaintiff's "labile affect; mostly subdued, mildly depressed, but other times very loud, some laughing, [] anxious." (Tr. 1370)

In May 2015, Plaintiff was admitted to an intensive outpatient program (IOP) at Centerpointe Hospital, which she attended two times per week. (Tr. 1506, 1514) Upon admission, psychiatrist Dr. Arain diagnosed Plaintiff with "Bipolar I Disorder, Most Recent Episode

---

[7] In a follow-up letter dated May 2015, Dr. Rao stated that Plaintiff was currently taking Latuda 40 mg BID and Ambien 10 mg, and her diagnosis was "Bipolar I, depressed with psychotic features." (Tr. 1036) Dr. Rao stated: "[Plaintiff] is not able to maintain employment and needs assistance with financial needs." (Id.)

11

Depressed, Moderate," anxiety, and borderline personality disorder, and he gave her a GAF score of 49. (Tr. 1516-17) Dr. Arain adjusted Plaintiff's Latuda to 80 mg every morning. (Tr. 1517)

In June 2015, Dr. Rao prescribed trazodone. (Tr. 1423) Dr. Rao observed Plaintiff's dysthymic affect in June, August, October, and December 2015. (Tr. 1419, 1420, 142, 1423) In December 2015, Dr. Arain discharged Plaintiff from the IOP because she was receiving inpatient mental health treatment at Mercy Hospital and assigned her a GAF score of 18. (Tr. 1512)

Plaintiff remained in Mercy Hospital's psychiatric unit due to depression, anxiety, and suicidal ideation from December 10 through December 13, 2015. (Tr. 1462-78) Plaintiff reported that her attendance at the IOP had been sporadic because "she has been paranoid that other patients are watching her and reading her chart." (Tr. 1462) When Plaintiff followed up with Dr. Mertens in early January 2016, she noted that her symptoms were "poorly controlled," and Plaintiff reported feeling "severely depressed every day and is having trouble functioning." (Tr. 1649-51)

On January 12, 2016, Dr. Arain readmitted Plaintiff to the IOP and assigned her a GAF score of 52. (Tr. 1510) Treatment notes from the IOP in mid-March 2016, stated that Plaintiff "has been upset today otherwise has been good," "her therapist suggested she is paranoid," and "feels uncomfortable with certain patients, males, feels they stare at her." (Tr. 1594) On examination, Plaintiff displayed an angry mood, anxious/irritable affect, and fair judgment and insight. (Tr. 1594-95) On March 31, 2016, Dr. Arain noted Plaintiff's reports of "some loss of pleasure in life, worry, tenseness, frustration, annoyance … depressed/labile mood, panic, panic attacks … paranoia …." (Tr. 1592-93) Dr. Arain discharged Plaintiff from the IOP at her request on March 31, 2016, and he advised her to see a community therapist. (Tr. 1593)

In October and November 2016, Dr. Rao observed that Plaintiff's affect was dysthymic. (Tr. 1846-47) When Plaintiff saw Dr. Rao in February 2017, she reported that she had not "been feeling good lately" and stated, "I think I've been paranoid." (Tr. 1845)

Plaintiff was voluntarily admitted to Mercy Hospital's psychiatric unit from March 17 through March 20, 2017. (Tr. 1570-73) Plaintiff reported suicidal ideation with a plan and "states that she gets very agitated at others and at time thinks of hurting them[.]" (Tr. 1570) Plaintiff experienced road rage and described a recent incident in which "she destroyed the home of a man she was dating, throwing things and destroying property." (Id.) Plaintiff also reported: increased crying and irritability; self-isolation; anxiety and panic attacks; difficulty with concentration and focus; "feel[ing] like people are against her and does not know who to trust"; and failing to answer her phone or pay bills. (Id.) On examination, Plaintiff's mood was depressed and irritable, affect was blunted, and attention, concentration, insight, and judgment were fair. (Tr. 1573) She was diagnosed with "bipolar disorder, most recent episode depressed, severe without psychotic features" and cluster B traits, and the doctor increased her Prozac. (Tr. 1574) At Plaintiff's request, a psychiatrist discharged Plaintiff but noted that she "still needs continued inpatient treatment[.]" (Tr. 1750)

Plaintiff continued monthly appointments with Dr. Rao from April 2017 through December 2017. On April 1, 2017, Plaintiff presented to Dr. Rao and stated that she was "getting better" with the increased dose of Prozac. (Tr. 1844) In May 2017, Plaintiff was "alright" but in July, September, and November 2017 she displayed a dysthymic affect. (Tr. 1839-40, 1482-43)

On December 1, 2017, Plaintiff presented to Mercy Hospital's emergency department with abdominal pain and vomiting and, on examination, the doctor noted her "depressed mood." (Tr. 1936, 1940). Plaintiff informed the emergency room doctor that "Dr. Rao wanted her admitted for

13

her bipolar. She states that she feels depressed at times and sometimes suicidal ideation...." (Tr. 1942) Plaintiff received a psychiatric consult and was admitted overnight. (Tr. 1942) The psychiatrist continued Plaintiff's Haldol, Latuda, and Seroquel. (Tr. 1955)

Plaintiff was voluntarily readmitted to Mercy Hospital's psychiatric unit from December 7 through December 11, 2017 due to "suicidal ideation with a plan and depression due to medical issues." (Tr. 1971-89) On examination, a psychiatrist noted that Plaintiff "presents as cooperative, tearful, overwhelmed, with depressed mood and flat affect. Pt makes poor eye contact … admits to suicidal thoughts with thoughts of overdosing." (Tr. 1982) Plaintiff told the psychiatrist, "I'm just shutting down and I don't want to live anymore." (Id.) Upon discharge, the psychiatrist continued Plaintiff's fluoxetine and lurasidone. (Tr. 1993)

When Plaintiff presented to Dr. Rao on December 13, 2017, her speech was rambling and affect was dysthymic. (Tr. 2029) Dr. Rao completed a second RFC assessment for Plaintiff five days later. (Tr. 1881-84) Dr. Rao listed Plaintiff's diagnosis as bipolar I disorder with psychosis and stated that her prognosis was "fair." (Tr. 1881) On a checklist form of mental abilities and aptitudes needed to perform unskilled work, Dr. Rao noted that Plaintiff had "no useful ability to function" in the following areas: maintain attention for two-hour segment; sustain an ordinary routine without special supervision; work in coordination with or proximity to others; complete a normal work day and week without interruptions from psychologically based symptoms; and get along with coworkers or peers. (Tr. 1883) Additionally, Dr. Rao opined that Plaintiff was "unable to meet competitive standards" in the following areas: remember work-like procedures; understand, remember, and carry out "very short and simple instructions"; make simple work-related decisions; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in routine work

14

setting; deal with normal work stress; interact appropriately with the general public, coworkers, supervisors; and maintain socially appropriate behavior. (Id.) In support of her assessment, Dr. Rao wrote: "Cannot function under stress, needs help with decisions regarding housing, finances." (Tr. 1883) Dr. Rao again estimated that Plaintiff would miss four or more days of work per month. (Tr. 1884)

Many health care providers who treated Plaintiff's physical impairments also noted her depression, mood swings, anxiety, and tearfulness. For example, Dr. Martens recorded the following observations: anxious and mildly agitated in August 2014; "labile affect … laughing at times, very sad appearing at times" and anxious in November 2014; "mildly depressed affect, anxious, displays a great deal of frustration and irritability" in June 2015; "good eye contact some of the time, but other times will not look at me, affect moderately depressed, moderately anxious, … very tearful" in August 2015; "affect severely depressed … [c]rying/sobbing entire visit, extremely anxious" in January 2016; "VERY STRESSED" in March 2016; and "mood depressed, affect tearful" in May 2016. (Tr. 734, 940, 1388, 1629, 1651, 1660, 1670, 1676)

A physician's assistant at Plaintiff's dermatologist's office noted that Plaintiff was: positive for anxiety and depression and her mood was "pleasant but anxious" in April 2017; "pleasant but anxious" in September 2017; and positive for anxiety and depression in November 2017 and February 2018. (Tr. 1690, 1724, 1907, 1920) When Plaintiff began seeing rheumatologist Dr. Shereen in August 2017, she informed him that she was "severely depressed" and he noted that she was "tearful at times during the exam." (Tr. 1601) Dr. Shereen again noted that Plaintiff was "severely depressed" in October 2017 and, in February 2018, Plaintiff was "tearful at times" and reported feeling "severely depressed." (Tr. 1605, 2143)

In her decision, the ALJ acknowledged that Plaintiff "has ongoing issues with her mental condition" but found that Plaintiff had experienced medical improvement relating to her ability to work. The ALJ based this decision on three principal factors. First, the ALJ noted that Plaintiff "admitted she was discharged from her psychiatrist's practice for missing too many appointments" and "she did not seek treatment with another psychiatrist for a long period of time[.]" (Tr. 19) Second, the ALJ relied on Dr. Rao's treatment notes reflecting stability and/or improvement. Finally, the ALJ found that Plaintiff's "activities of daily living and social interaction have improved significant[ly.]" (Tr. 16)

There is no dispute that Plaintiff did not receive psychiatric treatment for approximately one year after her original psychiatrist terminated her as a patient. Despite her primary care physician's repeated urgings to find a new psychiatrist, Plaintiff did not establish care with Dr. Rao until July 2014, after the SSA began the continuing disability review process. The Eighth Circuit has recognized that "a mentally ill claimant's noncompliance can be, and ordinarily is, the result of the mental impairment, and thus it is not deemed willful or unjustifiable." Watkins v. Astrue, 414 Fed.Appx. 894, 896 (8th Cir. 2011) (citing Pates-Fires v. Astrue, 564 F.3d 935, 945 (8th Cir. 2009)). Furthermore, even if Plaintiff's mental impairment improved, or at least stabilized in 2014, her medical records establish that her condition worsened significantly in April 2015, as she was hospitalized for depression and suicidal ideation.

The ALJ also based her medical improvement finding on Dr. Rao's checklist mental status examinations, which "consistently show generally normal clinical signs" and notations that Plaintiff was "okay" or "better." (Tr. 23) For example, the ALJ noted that Plaintiff told Dr. Rao she was "doing well," "okay," "fine," "alright," or "better" in September 2014, March 2015, May

16

2015, September 2015, October 2015, January 2016, February 2016, March 2016, May 2016, November 2016, May 2017, August 2017, and September 2017. (Tr. 21)

"[D]oing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity." Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) ("'doing well' as a chronic schizophrenic is not inconsistent with a finding of disability"). Additionally, "recognition must be given to the instability of mental impairments and their waxing and waning nature after manifestation." Lillard v. Berryhill, 376 F.Supp.3d 963, 984 (E.D. Mo. 2019). "Indeed, one characteristic of mental illness is the presence of occasional symptom-free periods." Id. (quoting Andler v. Chater, 100 F.3d 1389, 1393 (8th Cir. 1996)). "Given that a claimant's level of mental functioning may seem relatively adequate at a specific time, proper evaluation of the impairment must take into account a claimant's level of functioning 'over time.'" Frederick v. Berryhill, 247 F.Supp.3d 1014, 1029 (E.D. Mo. 2017).

A longitudinal review of Plaintiff's medical records reveals that her mental symptoms waxed and waned. After her April 2015 hospitalization, Plaintiff entered an IOP, which entailed twice-weekly group therapy sessions. In December 2015, Plaintiff was again hospitalized for depression, anxiety, and suicidal ideation.

In early 2016, Plaintiff was making progress with medications, participation in the IOP, and regular appointments with Dr. Rao. Following a gap in treatment between April and October 2016, Plaintiff's complaints of irritability and paranoia resumed in November 2016. She was hospitalized for three days due to suicidal ideation in March 2017, and she consistently complained of depression and anxiety in the following months. In early December 2017, Plaintiff spent one night in the hospital due to abdominal pain and depression. She returned to the emergency room later that month with depression and suicidal ideation, and she was hospitalized for four days.

Based on the totality of the of the evidence, Dr. Rao's mental status examinations and sporadic notations that Plaintiff was doing well do not constitute substantial evidence of medical improvement.

Finally, in finding Plaintiff was no longer disabled and could perform substantial gainful activity, the ALJ relied on the statements in the record relating to Plaintiff's activities of daily living. For example, the ALJ cited evidence that Plaintiff dressed, bathed, prepared simple meals, did laundry, grocery shopped, cleaned the bathroom, cared for her two teenaged children, played cards, and had at least one romantic relationship. (Tr. 14, 16) However, the Eighth Circuit has repeatedly held that "the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work." Burress, 141 F.3d at 881. "Just as a person with physical impairments need not be bedridden or completely helpless to be found disabled, a person with mental impairments does not have to be hospitalized or suicidal every day to be found disabled." Goolsby v. Berryhill, No. 4:17-CV-2508 NAB, 2019 WL 1326988, at *4 (E.D. Mo. Mar. 25, 2019) (citing Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005)).

Furthermore, a review of the record reveals that Plaintiff's daily activities were more limited than the ALJ suggested. For example, in her August 2014 function report, Plaintiff stated that she was able to dress and bathe herself, but she added "I don't really care to wash my hair or comb it" and noted that she required "special reminders to take care of personal needs and grooming." (Tr. 417-18) Plaintiff reported that she was able to prepare sandwiches, frozen dinners, and "anything that can be microwaved." (Tr. 418) In regard to chores, Plaintiff stated that she cleaned the bathroom and did laundry, but did not perform work outside because "I've tried and I have panic attacks from being overwhelmed." (Id.) Plaintiff was able to grocery shop

18

and handle her finances, but added "I don't pay on time and sometimes forget to pay bills." (Tr. 419) For enjoyment, Plaintiff watched television and talked to her mother. (Tr. 420) Although Plaintiff believed she was able to get along well with authority figures, she stated that she had been fired from at least one job because of problems getting along with other people, explaining, "I been told I have a bad attitude but I don't think so." (Tr. 421)

The ALJ also cited Plaintiff's testimony before the disability hearing officer in December 2014. (Tr. 14) According to the ALJ, Plaintiff "indicated she watched the early morning news, saw the children off to school, watched television, shopped, prepared meals, did laundry, but left most of the household chores to her children," and she enjoyed taking her children to the park in the summer, working out, and spending time outside, and playing cards with friends.[8] (Id.) While Plaintiff testified to these activities at the hearing, she qualified nearly every statement. For example, she stated: "I think I sleep most of the day … watch 5 am news and go to sleep after kids leave 'til 1 or 2 pm," "get up, sit around watch TV," and "try to wash clothes but forget." (Tr. 168) Plaintiff stated that her children did most of the housekeeping but sometimes Plaintiff "clean[ed] the kitchen counter." (Tr. 168) Plaintiff went to the grocery store about twice a month "but not when crowded." (Tr. 169) Plaintiff testified that she played cards "every now and then, maybe 1x/mo" and "tr[ied] to take kids to park" in the summer, but added, "[I] do way less now." (Tr. 168)

---

[8] The ALJ noted several times in the decision that Plaintiff "liked riding motorcycles with a male friend who taught her how to ride." (Tr. 14) This information is based on Dr. Mertens' treatment notes of May 2014, which state: "Saturday when riding motorcycle drove through swarm of bees and got stung 5 times." (Tr. 686) When the ALJ asked Plaintiff about riding motorcycles at the April 2015 hearing, she explained the motorcycle belonged "to a friend of mine[.] They was trying to teach me how to ride." (Tr. 50) Plaintiff affirmed that she had learned to ride a motorcycle, but stated "I haven't been on a bike in a long time…." (Id.) There is no evidence in the record that Plaintiff rode a motorcycle after May 2014.

19

Not only did the ALJ overstate the quality and frequency of Plaintiff's daily activities, but she failed to explain how those limited activities demonstrated an ability to sustain competitive employment. See, e.g., Dixon, 324 F.3d at 1102. In this case, the evidence of Plaintiff's limited daily activities does not support the ALJ's finding of medical improvement. To the contrary, substantial evidence on the record as a whole establishes that Plaintiff's bipolar disorder, depressed with psychotic features, was no better in August 2018 than when she was awarded disability in June 2010.[9] See, e.g., Scott, 2012 WL 1324519, at *2

## VI. Conclusion

For the reasons stated above, the Court finds that substantial evidence in the record as a whole does not support the Commissioner's decision that Plaintiff's disability ceased in August 2014. Accordingly,

**IT IS HEREBY ORDERED** that pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED** and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

An order of remand shall accompany this memorandum and order.

*Patricia L. Cohen*

PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 29th day of June, 2021

---

[9] Because the Court agrees with Plaintiff that there was not substantial evidence in the record as a whole supporting the Commissioner's decision, the Court does not address her arguments that "some medical evidence" did not support the RFC and the ALJ improperly assessed Dr. Rao's medical opinion. See, e.g., Burress, 141 F.3d at 881 n. 11.